IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

LAWRENCE LAMB,

    Plaintiff,

v.                                                                               1:22-cv-00485-WJ-LF

JOSE CORDERO, CHRIS MARQUEZ,
and NEW MEXICO CORRECTIONS
DEPARTMENT,

    Defendants.

## REPORT AND RECOMMENDATION

THIS MATTER comes before the Court on plaintiff Lawrence Lamb's Motion for Spoliation Sanctions Against Defendants, filed on April 10, 2023. Doc. 48. Defendants Jose Cordero, Chris Marquez, and the New Mexico Corrections Department ("NMCD" and collectively "defendants") filed their response on May 1, 2023. Doc. 54. Mr. Lamb filed his reply on May 15, 2023. Doc. 58. On February 27, 2024, the Honorable William P. Johnson referred this motion to me "to conduct hearings, if warranted, including evidentiary hearings, and to perform any legal analysis required to recommend to the Court an ultimate disposition of the Motion." Doc. 63. Having read the submissions of the parties, I find that the motion is not well taken, and I recommend that the Court DENY it.

**I.    Background Facts**

Mr. Lamb is an inmate in the custody of NMCD. Doc. 1-1 at 1. This case arises from an incident on June 21, 2019, when corrections officers Jose Cordero and Chris Marquez attempted to transport Mr. Lamb and seven other inmates from the Central New Mexico Correctional Facility ("CNMCF") in Los Lunas, New Mexico, to the Northeast New Mexico Correctional Facility ("NENMCF") in Clayton, New Mexico. *Id*. at 2; *see also* Doc. 54 at 1–2. Officer

Cordero was driving, and Officer Marquez was acting as escort.  Doc. 48-2 at 4; Doc. 48-3 at 3–4.

      A.  <u>The Transport</u>

Transport van #5389 departed CNMCF at approximately 6 a.m. with eight inmates, including Mr. Lamb.  Doc. 48-8 at 1; Doc. 54 at 1–2.  Mr. Lamb contends that during the initial leg of the transport, the van reached speeds up to 90 mph as it was traveling along I-25.  Doc. 48 at 1.  Officer Cordero denies that he was speeding.  *Id*. at 1 n.1.  At around 7:40 a.m., the transport van experienced a flat tire near Rowe, New Mexico.  Doc. 1-1 at 3; Doc. 54 at 3.  Mr. Lamb alleges that "the rear passenger side tire blew out ripping a hole directly beneath [him] in the van's plywood floor and spray[ed] large quantities of debris into the passenger compartment."  Doc. 1-1 at 3.  Mr. Lamb alleges that he was injured from the debris coming into the passenger compartment of the van.  *Id*.  Officer Cordero pulled onto the shoulder of I-25, and the officers notified their supervisor that they were stranded due to a flat tire.  Doc. 1-1 at 3; Doc. 48 at 2.  Officers Marquez and Cordero required the inmates to wait inside the van on the side of the road for over two hours until a substitute van was provided.  Doc. 48 at 2; Doc. 54 at 3.  According to Mr. Lamb, the officers initially turned off the van, which quickly became hot inside.  Doc. 1-1 at 4.  After the inmates complained, Officer Cordero restarted the van and turned on the air conditioning.  *Id*.  The van was warm inside even with the air conditioner running.  *Id*.  More than two hours later, at 10:00 a.m., Philip Romero, a garage specialist at CNMCF, arrived and replaced van #5389 with van #4750.  Doc. 54 at 3.

Officers Marquez and Cordero then proceeded to take the inmates in van #4750 to the Penitentiary of New Mexico in Santa Fe ("PNM") to have them evaluated by medical staff.  Doc. 48 at 2; Doc. 54 at 3.  The inmates were escorted into the facility, evaluated by medical staff,

photographed, given food and water, and then returned to the van. Doc. 54 at 3. Instead of continuing on to their original destination, NENMCF, the officers took the inmates back to CNMCF where they were again evaluated by medical personnel. *Id*. According to defendants, the air conditioning stopped working in the back of the second van on the way back to CNMCF.[1] Doc. 48-8 at 1.

      B.   The Video Cameras

Transport vans are equipped with video cameras. Doc. 48 at 2; Doc. 48-2 at 2; Doc. 48-3 at 2. The camera footage from transport vans is stored on a hard drive in each van. Doc. 48 at 3; Doc. 54 at 2. Officers are instructed that at the conclusion of a transport, they are to remove the hard drive from the van and leave it on the supervisor's desk. Doc. 48 at 3; Doc. 54 at 2. The supervisor then downloads the hard drive onto a computer. Doc. 54 at 2.

During the inspection of van #5389 prior to transport, the camera equipment was working. Doc. 54 at 2. There is no dispute that the cameras were working during the first hour or so of the transport. Doc. 48-2 at 4; Doc. 48-3 at 3. However, according to the officers, about an hour into the transport, the cameras stopped working. *See id*. The officers noted on the transport log "Camera Not Working" at 7:00 a.m. Doc. 48-8. While the hour between 6 and 7 a.m. may have been recorded on the camera's hard drive, no portion of Mr. Lamb's complaint addresses any events that occurred in the first hour of the transport except to allege that the van was being driven "at an excessive rate of speed, as fast as 90 miles per hour." Doc. 1-1 at 3, ¶ 13. Additionally, when van #5389 was returned to CNMCF on June 21, 2019, neither Officer Marquez nor Officer Cordero removed the hard drive from the van because they were not the

---

[1] Mr. Lamb alleges in his complaint that the air conditioning in van #4750 never worked, *see* Doc. 1-1 at 4–7, but this factual dispute does not affect my analysis.

3

ones who returned the van to the facility.  Doc. 54 at 2.  Instead, Mr. Romero returned van #5389 to CNMCF, and he did not know if the hard drive was removed from the van when it was returned.  *Id.* at 2–3.  Consequently, there is no video footage from van #5389 either before or after the tire blew out.

There also are video cameras positioned in the sally ports at CNMCF and PNM.  The cameras in the sally ports potentially would have captured video of the substitute van stopping at both PNM and then at CNMCF.  Doc. 48 at 2.  The video footage from the sally port cameras was recorded over in the regular course of business by an automatic process.  Doc. 54 at 8.

      C.  <u>Mr. Lamb's Motion and Defendants' Response</u>

In his motion, Mr. Lamb argues that defendants should be sanctioned for spoliation of the video evidence from van #5389 as well as video evidence from the sally ports at PNM and CNMCF.  Doc. 48.  As a sanction, Mr. Lamb asks that the Court give a jury instruction allowing the jury to infer that the contents of the destroyed video evidence would have been unfavorable to the defendants.  *Id.* at 10.  In response, defendants argue that Mr. Lamb cannot establish that video evidence from the transport van ever existed.  Doc. 54 at 5–6.  They further respond that the video evidence from the sally ports was negligently destroyed, which does not rise to the level of spoliation, and that Mr. Lamb has not made a showing of bad faith.  *Id.* at 6–7.  Defendants further contend that Mr. Lamb has not shown any actual prejudice.  *Id.* at 7–8.

**II.**    **Discussion**

Spoliation is the intentional destruction of evidence that is presumed to be unfavorable to the party responsible for its destruction.  *Moreno v. Taos Cnty. Bd. Of Comm'rs*, 587 F. App'x 442, 444 (10th Cir. 2014); *see also Fox v. Steepwater LLC*, No. 2:16-cv-796, 2018 WL 2208308, at *2 (D. Utah May 14, 2018) ("Spoliation of evidence is the destruction or significant alteration

4

of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.") (internal citation and quotations omitted). "Thus, spoliation is both the destruction of evidence and/or the failure to preserve evidence." *Fox*, 2018 WL 2208308, at *2.

Prospective litigants have an obligation to preserve evidence when they are on notice that the evidence is relevant to litigation or when they should have known that the evidence may be relevant to future litigation. *Browder v. City of Albuquerque*, 209 F. Supp. 3d 1236, 1243 (D.N.M. 2016); *see also Moreno*, 587 F. App'x at 444 (10th Cir. 2014) ("Sanctions for spoliation of evidence are appropriate when the party had a duty to preserve the evidence because it knew or should have known that litigation was imminent, and the other party was prejudiced by the destruction of the evidence.") (internal citation and quotations omitted). "The two most important factors the Court considers in determining spoliation sanctions are (1) culpability of the offending party; and (2) actual prejudice to the other party." *Browder*, 209 F. Supp. 3d at 1245 (internal quotation marks and citation omitted).

"If spoliation has occurred, a court may impose a variety of sanctions including dismissal, judgment by default, preclusion of evidence, imposition of an adverse inference, or assessment of attorney's fees and costs." *Fox*, 2018 WL 2208308, at *2 (collecting cases). "The severity of the sanction should correspond to the willfulness of the spoliator's destructive act and the prejudice suffered by the non-spoliating party." *Ward v. Nesibo*, No. 4:22-cv-00054, 2023 WL 8261670, at *2 (D. Utah Nov. 29, 2023). A spoliation sanction is proper where: "(1) a party has a duty to preserve evidence because it knew, or should have known, that litigation was imminent, and (2) the adverse party was prejudiced by the destruction of the evidence." *Jones v. Norton*, 809 F.3d 564, 580 (10th Cir. 2015).

As a sanction, Mr. Lamb asks that the Court "give a jury instruction allowing the jury to infer the contents of the destroyed video evidence would have been unfavorable to the Defendants." Doc. 48 at 10. "An adverse inference instruction may be an appropriate sanction for spoliation of evidence. But to warrant an adverse inference instruction, a party must submit evidence of intentional destruction or bad faith." *Moreno*, 587 F. App'x at 445. "Mere negligence in losing or destroying records is not enough because it does not support an inference of consciousness of a weak case." *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1407 (10th Cir. 1997). Bad faith requires "some showing of willful destruction of evidence." *Browder*, 187 F. Supp. 3d at 1300 n.6 (D.N.M. 2016) (collecting cases). Accordingly, I first examine whether spoliation occurred for each of the two categories of evidence: the video evidence from the transport van and the video evidence from the sally port. Then, if spoliation has occurred, I consider whether there is evidence of intentional destruction or bad faith such that an adverse inference instruction is warranted.

  A. <u>Video Evidence from the Transport Van</u>

Defendants argue that Mr. Lamb has not established that beyond the first hour, any video from the transport van existed. Doc. 54 at 5–6. Both officers testified that the camera stopped working about an hour into the transport. Doc. 48-2 at 4; Doc. 43-3 at 3. On the transport log there is a notation at 0700 hours that states, "Well being check, no problems to report. -Camera Not Working-." Doc. 48-8. Defendants also point out that Stephen DeBerry, NMCD IT Network Administrator, determined that there was no video stored on the Coban system at CNMCF for van #5389 for June 21, 2019, and no evidence that any video from that day had been erased. Doc. 54 at 6; Doc. 54-5 at 2.

I agree with Defendants' assessment.  Any video from van #5389 likely was not preserved because the transport officers did not take the van back to CNMCF.  Instead, Philip Romero, a garage specialist, returned van #5389 to CNMCF.  Doc. 54 at 2; Doc. 54-3 at 2. While the transport officers were trained to remove the hard drive and leave it with the supervisor for downloading, Doc. 54 at 2; Doc. 54-2 at 2, there is no evidence that Mr. Romero understood he needed to remove the hard drive from the van for downloading, Doc. 54-3 at 2.[2] Further, there is no evidence that anyone ever actually viewed the video.  *Cf. Browder*, 209 F. Supp. 3d at 1246 ("Deputy Gonzales viewed footage from the correct date and determined there was nothing relevant to the investigation. . . .") (internal quotation marks omitted).  These circumstances render it unclear whether video footage from van #5389 was recorded at all, let alone that the hard drive was provided to a supervisor or that the video was reviewed.  The dubious nature of this evidence is insufficient to support a finding of spoliation.

Notwithstanding the lack of support for a finding of spoliation, however, I pause to address one additional point made by Mr. Lamb.  He contends that the notation on the transport log that the camera had stopped working is suspect and suggests that the officers added the notation after-the-fact to conceal whatever the video may have contained.  Doc. 48 at 4.  I agree that it is convenient that the camera stopped working shortly before the van's tire experienced a

---

[2] Plaintiffs refer to a related case—in which another inmate who was on the same transport van as Mr. Lamb sued defendants for the same incident—and explain that in response to a similar motion for sanctions, these same defendants admitted that the hard drive from van #5389 was found in the Transport Office on February 8, 2021, more than 19 months later.  *See* Doc. 48 at 2–3 (referring to *Tijerina v. New Mexico Corrections Dept., et al.*, No. 1:20-cv-00706-JAP-JHR (D.N.M. April 6, 2021) (Doc. 58 at 6)).  This admission, however, does not necessarily show that video from June 21, 2019, ever existed.  As NMCD explained, the hard drive was never requested; only the video was requested.  *See id.*  Further, NMCD was not able to identify who brought the hard drive to the Transport office or when, and there was no evidence that video from June 21, 2019, was ever on that hard drive.  *See id.*

blowout.  This speculation alone, however, does show that any video after 7:00 a.m. ever existed.  Nonetheless, there is no question that Mr. Lamb is at a disadvantage because without any video at all, including video from the first hour of the transport, he cannot show that the video may have been tampered with or turned off instead of merely having stopped working.  I consider below how best to address this disadvantage, even if spoliation sanctions are inappropriate.

Courts have noted that where evidentiary issues do not rise to the level of spoliation, cross-examination can patch the holes in the record.  *See Kretzschmar v. Big Horn Power Sports, LLC*, No: 13-CV-87, 2014 WL 11515825, at *2–3 (D. Wyo. May 15, 2015) (despite spoliation rules not applying to motorcycle part disassembled before litigation was imminent, cross-examination of individual who disassembled the part regarding the loss of evidence is permissible); *Marquez v. Albuquerque Pub. Schs.*, No. 1:18-cv-00133-MV-SCY, 2019 WL 5595180, at *1 n.1, *3 (D.N.M. Oct. 30, 2019) (finding that plaintiff was not entitled to spoliation sanctions but observing that she "has other means of addressing the destruction of the [evidence], such as through the cross-examination of" the relevant witness at trial); *see also Estate of Trentadue ex rel. Aguilar v. United States*, 397 F.3d 840, 862 (10th Cir. 2005) (considering the fact that purported destroyer of evidence had his credibility "thoroughly tested" via cross examination when finding that the district court "did not commit clear error in finding no intentional destruction of evidence"); *but see Mueller v. Swift*, No. 15-cv-1974, 2017 WL 3058027, at *5 (D. Colo. July 19, 2017) (framing cross-examination regarding spoliation of evidence as a sanction).

Mr. Lamb directs the Court to District Judge Herrera's opinion in *Casias v. New Mexico Department of Corrections*, No. 1:16-cv-00056-JMC-SCY, 2018 WL 4326991 (D.N.M. Sept. 10, 2018) and asserts that the Court should fashion a similar sanction as Judge Herrera did in that

8

case.  Doc. 48 at 5.  In *Casias*, Judge Herrera considered destroyed video from inside a sally port.  2018 WL 4326991, at *2–4.  Judge Herrera was not convinced that the defendant destroyed any relevant video footage from inside the sally port area in bad faith.  *Id.* at *3.  "There is no conclusive evidence establishing that a second sally port video camera was operational and recorded footage of the incident in question."  *Id*.  But Judge Herrera agreed that the presence of video cameras was relevant, and she permitted plaintiff to question witnesses concerning the video camera evidence and the reasons why evidence from inside the sally port area would not be presented at trial.  *Id.* at *4.  Judge Herrera declined to give an adverse inference instruction.  Instead, she permitted "an instruction that allows the jury to make any inference they believe appropriate in light of the evidence regarding the video cameras . . . ."  *Id.*  Here, as in *Casias*, the presences of video cameras inside van #5389 is relevant to the events that occurred inside the van, but there is no conclusive evidence establishing that the video camera was operational and recorded footage after 7:00 a.m.  Given the similarity in facts, I find that the approach taken by Judge Herrera in *Casias* is appropriate.

      I recommend, therefore, that Mr. Lamb be afforded some latitude at trial when examining witnesses about the camera in van #5389, issues surrounding when the camera stopped working, including the notation on the transport log, why that initial hour of video was not recovered, and the reasons why video evidence from the camera in van #5389 will not be presented at trial.  The jury is capable of deciding whether the officers' statements are credible with regard to video footage, or lack thereof, from the camera in van #5389.  I further recommend that the Court give an instruction that allows the jury to make any inference they believe appropriate in light of the evidence regarding the video from van #5389.

B.  <u>Video Evidence from the Sally Ports</u>

    i.    *Duty to Preserve*

Mr. Lamb contends that video from PNM and CNMCF sally ports should have been saved and preserved. Doc. 48 at 2, 4. He argues that the sally port cameras would have shown the condition of the inmates as they arrived at the respective facilities. *Id*. at 2, 8. Defendants admit that there were videos from the sally ports, but that video footage was not saved before it was recorded over. Doc. 54 at 6. Defendants explain that Lieutenant George Garcia completed a "Serious Incident Report" of the June 21, 2019 incident that same day. Doc. 54 at 3–4. Lt. Garcia did not request, look at, or include any video evidence in that report. *Id*. Defendants admit that "as a part of the 'incident' an inmate [was] injured and transported by ambulance to the hospital," Doc. 54 at 3, although that inmate was not Mr. Lamb. Defendants argue that "nothing was alleged to have occurred in the sally port other than the inmates going into and coming out of the facility." Doc. 54 at 3. In his deposition, Lt. Garcia acknowledged that an inmate was taken from the prison by ambulance and that the emergency personnel would have taken the inmate through the sally port, but "[t]here was no incident that occurred *in* the [sally port] so there was no need to submit video from the [sally port]." Doc. 54-4 at 2 (emphasis added). Consequently, the videos from the sally ports were automatically taped over in the regular course of business. Doc. 54 at 8.

I find that defendants had a duty to preserve the video tapes from the sally ports. "When litigation is 'reasonably foreseeable' is a flexible fact-specific standard that allows a district court to exercise the discretion necessary to confront the myriad factual situations inherent in the spoliation inquiry." *Browder*, 209 F. Supp. 3d at 1244. Here, litigation was reasonably foreseeable almost immediately upon the inmates' return to CNMCF or shortly thereafter. Mr.

Lamb alleges that he and the other inmates were confined to the back of a hot van for more than two hours on the side of the highway waiting for a substitute van to arrive before proceeding to PNM. He also alleges that the air conditioning was not working in the back of the second van, Doc. 1-1 at 4–7, and defendants concede it was not working for at least part of the trip back to CNMCF, *see* Doc. 48-8 at 1. Indeed, Officer Marquez "called master control to have medical ready at [the] sally port." *Id*. at 2. Mr. Lamb alleges that after returning to CNMCF, he received a medical assessment that found he was severely dehydrated, in shock, and required further medical treatment. Doc. 48 at 2. Lt. Garcia prepared a serious incident report. Doc. 54 at 3. Also, Mr. Lamb filed an inmate complaint within a week of the incident and an inmate grievance on July 13, 2019, in which he expressly stated a "tort claim or civil claim to follow." Doc. 58 at 2. Finally, Mr. Lamb submitted a tort-claims notice on September 6, 2019. *Id*. Defendants' argument that they were not on notice of imminent litigation until September 6, 2019, when they received a tort claims notice, is unpersuasive.[3] Under the circumstances, defendants should have known on June 21, 2019, or shortly thereafter, that litigation was imminent, and that any video evidence at the sally ports should be preserved. Because I find that the defendants had the duty to preserve the video from the sally ports, I will analyze the defendants' culpability and the resulting prejudice to plaintiff.

   ii. *Culpability*

"Culpability is the degree of fault to be assigned to the offending party." *Browder*, 209 F. Supp. 3d at 1245 (internal citation and quotations omitted). "[T]he destruction of potentially

---

[3] Defendants explain that the preservation period at CNMCF is 53 days and the preservation period at PNM is 50 days. By the time defendants received the tort claims notice, it was 77 days after the incident. Doc. 54 at 6–7. Thus, when they received the tort claims notice, the video from the sally ports had been automatically recorded over. *Id*.

11

relevant evidence obviously occurs along a continuum of fault—ranging from innocence through the degrees of negligence to intentionality." *Id.* Defendants argue that the destruction of the sally port videos was negligence, and therefore an adverse instruction is not appropriate. Doc. 54 at 6–7. "A party does not engage in spoliation when, without notice of the evidence's potential relevance, it destroys the evidence according to its policy or in the normal course of its business." *United States v. $40,955.00 in U.S. Currency*, 554 F.3d 752, 758 (9th Cir. 2009).

> [T]he general rule is that bad faith destruction of a document relevant to proof of an issue at trial gives rise to an inference that production of the document would have been unfavorable to the party responsible for its destruction. The adverse inference must be predicated on the bad faith of the party destroying the records. Mere negligence in losing or destroying records is not enough because it does not support an inference of consciousness of a weak case.

*Aramburu*, 112 F.3d at 1407 (internal citations omitted).

While defendants were on notice of the evidence's potential relevance to future litigation, they argue that nothing of significance happened in the sally ports "other than the inmates going into and coming out of the facility." Doc. 54 at 3. Further, Mr. Lamb himself does not allege that anything significant happened in the sally ports. Most of the events that allegedly caused Mr. Lamb's injuries took place inside the transport vans. The sally port video may have shown Mr. Lamb's condition when he arrived at and left those facilities, but there is other evidence—such as medical records—that documents his condition. Given that nothing of significance occurred in the sally ports, it was not unreasonable for defendants to allow the video from the sally ports to be recorded over in the normal course of business. The destruction of the video tapes, therefore, does not rise to the level of bad faith.

      iii.   *Prejudice*

"Prejudice is shown when the destroyed evidence goes to a critical issue and the evidence at hand is conflicting." *Browder*, 209 F. Supp. 3d at 1246. Here, the destroyed evidence—the

sally port videos—does not go to a critical issue. As discussed above, nothing of any significance occurred in the sally ports. Mr. Lamb alleges he was injured inside the transport vans, not in the sally ports. Mr. Lamb contends that the sally port videos could show his condition coming from the vans and whether and to what extent other inmates required assistance getting on and off the van. Doc. 58 at 3.

Additionally, "[p]rejudice by loss of evidence must be measured in light of other evidence available." *Phillip M. Addams & Assocs., LLC v. Dell, Inc.*, 621 F. Supp. 2d 1173, 1195 (D. Utah 2009) (internal quotation marks omitted). Here, evidence outside of the sally port recordings is ample. Mr. Lamb was medically treated for severe dehydration and shock when he returned to CNMCF, and his injuries can be established with medical records, experts, and his own testimony. Further, defendants concede that the incident "involved an[other] inmate being injured and transported to the hospital by ambulance" through the sally port. Doc. 54 at 3. Thus, the sally port video would provide only minimal additional probative evidence.

I therefore find that Mr. Lamb is only minimally prejudiced by the loss of the sally port videos. Consequently, I recommend that the Court decline to issue an adverse jury instruction. However, although the destruction of this evidence does not rise to the level of intentional destruction or bad faith, cross-examination remains a useful tool to address the sally port footage's somewhat conspicuous absence. As was true with respect to the absence of the video from the transport van, I recommend that the Court permit Mr. Lamb to explore on cross-examination why videos from the sally ports will not be presented at trial.

**III.     Conclusion**

For the reasons stated above, I recommend that the Court DENY Mr. Lamb's motion with respect to the transport van video but give Mr. Lamb some latitude in cross examining witnesses regarding the video footage from van #5389 as described above.  I further recommend that the Court give an instruction that allows the jury to make any inference they believe appropriate in light of the evidence regarding the video from van #5389.  Further, I recommend that the Court DENY Mr. Lamb's motion with regard to the video footage from the sally ports because defendants' destruction of the video was merely negligent and not done in bad faith.  Also, Mr. Lamb is minimally prejudiced by the destruction of the sally port videos.  Nonetheless, I recommend that Mr. Lamb be permitted to cross-examine defense witnesses about the absence of these videos.

**THE PARTIES ARE NOTIFIED THAT WITHIN 14 DAYS OF SERVICE of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1).  Written objections must be both timely and specific.** *United States v. One Parcel of Real Prop., With Buildings, Appurtenances, Improvements, & Contents, Known as: 2121 E. 30th St., Tulsa, Oklahoma*, **73 F.3d 1057, 1060 (10th Cir. 1996).  A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition.  Failure to file timely and specific objections will result in waiver of** *de novo* **review by a district or appellate court.** *Id*.  **In other words, if no objections are filed, no appellate review will be allowed.**

_____
Laura Fashing
United States Magistrate Judge

14